UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------------------------------------------

Sean Wright,                                     No. 0:14-cv-03031-SRN-HB

　　　　　　　Plaintiff,

　　　v.

Target Corporation; et al.,

　　　　　　　Defendants.

---

### DEFENDANT TARGET CORPORATION'S
### MEMORANDUM OF LAW
### IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

---

Defendant Target Corporation has filed a motion for summary judgment. Target respectfully submits this memorandum of law in support of its motion.

**Issue**

Under the Telephone Consumer Protection Act, where a consumer has given his prior express consent for calls to a cellular telephone, can a caller contractually protect itself against an after-the-fact claim of oral revocation where the consumer agreed to the contractual provision and has neither obtained the caller's consent to modify the contract nor furnished any consideration?

**Undisputed Facts**[1]

1.   Plaintiff Sean Wright claims that Target violated the Telephone Consumer

Protection Act by calling him on his cell phone[2] about his wife's account.

2.   On March 19, 2013, Mr. Wright's spouse Jodie L. Wright opened a Target

credit-card account.[3]

3.   On or about April 10, 2013, Mr. Wright signed a Joint Account Request

and Agreement, including a statement that read:

> You are requesting that you be added to the account
> referenced above as a joint accountholder and that a credit
> card be issued to you. You agree to be bound by the Credit
> Card Agreement that will be sent to you along with your
> credit card and you, jointly and individually, promise to pay
> and be liable for, all amounts charged to the account under
> the terms set forth in the Credit Card Agreement. The balance
> on the above referenced account as of March 25, 2013 is
> $183.64. Once you are added to the above referenced account
> as a joint accountholder you become a permanent joint
> accountholder and your name cannot be removed in the
> future.[4]

4.   The Joint Account Request and Agreement that Mr. Wright signed

contained this statement, in bold capitals:

---

[1]Cited as "Facts."

[2]Compl. [Doc. 1], ¶ 8 at 2.

[3]Wolf Decl., ¶ 3 at 1.

[4]Am. Resps. Reqs. Admis. [Ex. L], Nos. 1–4; Joint Account Request &
Agreement [Ex. A]; Wolf Decl., ¶ 4 at 1–2; Target's Answers Interrogs. [Ex. J],
No. 6 at 5.

> YOU CONSENT TO RECEIVING AUTODIALED AND
> PRERECORDED MESSAGE CALLS FROM US, OR
> THOSE ACTING ON OUR BEHALF OR TARGET
> CORPORATION, ITS AFFILIATES OR THOSE ACTING
> ON TARGET'S BEHALF, AT ANY MOBILE
> TELEPHONE NUMBER YOU PROVIDE.[5]

5.   On the Joint Account Request and Agreement, directly beneath the

statement about "CONSENT TO RECEIVING AUTODIALED AND

PRERECORDED MESSAGE CALLS . . . AT ANY MOBILE

TELEPHONE NUMBER YOU PROVIDE," Mr. Wright provided the

number "304-374-5651."[6]

6.   The number 304.374.5651 is Mr. Wright's cell-phone number.[7]

7.   The number 304.374.5651 is the number at which Target was calling Mr.

Wright on the calls that are the subject of his complaint.[8]

8.   The Target Consumer Credit Agreement that applied to Mr. Wright's

Target credit-card account provided:

> 12.   COMMUNICATIONS WITH YOU — We or our agents may
> call by telephone regarding your Account. You agree that we
> may place such calls using an automatic dialing / announcing

---

[5]Am. Resps. Reqs. Admis. [Ex. L], No. 5; Joint Account Request &
Agreement [Ex. A]; Wolf Decl., ¶ 5 at 2; Target's Answers Interrogs. [Ex. J], No.
5 at 4.

[6]Am. Resps. Reqs. Admis. [Ex. L], No. 6; Joint Account Request &
Agreement [Ex. A]; Wolf Decl., ¶ 6 at 2.

[7]Compl. [Doc. 1], ¶ 8 at 2; Am. Resps. Reqs. Admis. [Ex. L], No. 7.

[8]Am. Resps. Reqs. Admis. [Ex. L], No. 8; Wolf Decl., ¶ 7 at 2.

device. You agree that we may make such calls to a mobile telephone or other similar device. . . .

13. WHAT LAW APPLIES — This Agreement will be governed by federal law and to the extent state law applies, by the law of South Dakota. If there is any conflict between any of the terms and conditions of this Agreement and applicable federal or state law, this Agreement will be considered changed to the extent necessary to comply with the law.

. . . .

17. CHANGES TO THIS AGREEMENT — We have the right to change this Agreement (including the right to add additional terms) and to apply those changes to any existing balance on the Account as permitted by law. We will provide you with notice of any such changes as required by applicable law.[9]

9. Mr. Wright did not have the right to unilaterally change the interest charges, the late fees, or any of the terms or conditions of the Target Credit Card Agreement that applied to his Target credit-card account.[10]

10. Mr. Wright purchased goods or services at a Target store using his Target credit card. The Sales Audit Copy contains an electronic copy of Mr. Wright's signature from a transaction in which he purchased goods or services at a Target store.[11]

11. Mr. Wright made one or more payments on on his Target credit-card account. The check numbered 20304, and which bears document number

---

[9]Wolf Decl., ¶ 8 at 2–3; Target Consumer Credit Agreement [Ex. B] at T019, panel 6; *see also* Am. Resps. Reqs. Admis. [Ex. L], Nos. 9–10; *id.*, No. 15.

[10]Wolf Decl., ¶ 9 at 3; *see* Am. Resps. Reqs. Admis. [Ex. L], Nos. 17–18.

[11]Wolf Decl., ¶ 10 at 3; Sales Audit Copy [Ex. E]; *see* Am. Resps. Reqs. Admis. [Ex. L], No. 24.

T008, contains Mr. Wright's signature on a payment to "Target Car[d] Services."[12]

12.    On December 13, 2013, the Wrights' credit-card account became past due.[13]

13.    On December 20, 2013, Mr. Wright's spouse Jodie L. Wright told Target that Mr. Wright would be responsible for payments on the Target credit-card account.[14]

14.    On April 29, 2014, a Target caller reached Mr. Wright, who claimed that the account was not his and said that he would not be making any payment on the account. Mr. Wright would not let Target's caller speak, and then hung up.[15]

15.    On May 14, 2014, a Target caller reached Mr. Wright, who said that he had not authorized his name to be added to the account. Target's caller advised him that the account was in collection and that he was still responsible for payment. Mr. Wright hung up on the caller.[16]

---

[12]Am. Resps. Reqs. Admis. [Ex. L], No. 25; Wolf Decl., ¶ 11 at 3; Check No. 20304 [Ex. D].

[13]Wolf Decl., ¶ 12 at 3.

[14]*Id.*, ¶ 13 at 3; TSYS Archived Notes [Ex. C] at T107; *see* Am. Resps. Reqs. Admis. [Ex. L], No. 22 ("Plaintiff cannot admit or deny").

[15]Wolf Decl., ¶ 14 at 3; TSYS Archived Notes [Ex. C] at T109.

[16]Wolf Decl., ¶ 15 at 3; TSYS Archived Notes [Ex. C] at T110.

19.  On May 21, 2014, a Target caller reached Mr. Wright. Mr. Wright

repeatedly denied that he owed any obligation on his wife's account.[17] A

transcript of their conversation accompanies this memorandum as Exhibit

M.

20.  On May 31, 2014, a Target caller reached Mr. Wright, who said that he was

going through a divorce and did not know that his wife added him to the

account. Mr. Wright told Target's caller to speak to his lawyer, but hung up

without giving a lawyer's name or contact information.[18]

21.  On May 31, 2014, shortly after Mr. Wright hung up on Target's caller,

David Menditto of Hyslip & Taylor called Target about Mr. Wright's

account and asked that calls stop. The Target employee informed Mr.

Menditto that Target could not speak with him about the account without a

power of attorney on file.[19]

22.  On June 4, 2014, an unidentified third party called Target about Mr.

Wright's account. The Target employee who took the call informed the

---

[17]Wolf Decl., ¶ 16 at 3; TSYS Archived Notes [Ex. C] at T110.

[18]Wolf Decl., ¶ 17 at 4; TSYS Archived Notes [Ex. C] at T111.

[19]Wolf Decl., ¶ 18 at 4; TSYS Archived Notes [Ex. C] at T111.

third party that Target could not speak with him about the account without a power of attorney on file.[20]

23.    Target has never received a power of attorney authorizing it to communicate with any third party about the Wrights' account.[21]

24.    Target instructs its employees not to communicate with any third party about a cardholder's account, and not to furnish information to or accept instructions from any third party about a cardholder's account, unless the cardholder has given a power of attorney or other written instructions to Target authorizing communication with the third party. This policy is intended both to prevent identity theft and to comply with the Graham–Leach–Bliley Act's prohibition against "disclos[ing] to a nonaffiliated third party any nonpublic personal information."[22]

25.    The Target credit card is issued by TD Bank USA, N.A., and serviced by Target Corporation's subsidiary Target Corporate Services, Inc., which provides collection services in connection with Target-branded credit-card accounts.[23]

---

[20]Wolf Decl., ¶ 19 at 4; TSYS Archived Notes [Ex. C] at T111.

[21]Wolf Decl., ¶ 20 at 4.

[22]*Id.*, ¶ 21 at 4.

[23]*Id.*, ¶ 2 at 1.

### Legal Standard

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."[24] The Supreme Court of the United States has endorsed summary judgment in a case where applying the law to the facts compels but one result:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." . . . . Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.[25]

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[26]

---

[24]Fed. R. Civ. P. 56(a).

[25]*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

[26]*Marten v. Godwin,* 499 F.3d 290, 295 (3d Cir. 2007) (quoting *Celotex*).

The mere presence of a factual dispute will not preclude summary judgment.[27] A disputed fact must be *material*: "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."[28] And even a disputed material fact will not overcome a motion for summary judgment unless the evidence can satisfy the applicable evidentiary standard. A mere "scintilla" will not suffice:[29] "If the evidence is merely colorable, or not significantly probative, summary judgment may be granted."[30]

## Argument

The key issue in this case is whether "prior express consent" under the Telephone Consumer Protection Act can be revoked when the consent is embodied in a bilateral written agreement.

---

[27]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact" (Court's emphasis)).

[28]*Id.* at 248.

[29]*Id.* at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)).

[30]*Id.* at 249–50 (internal citations omitted).

I.  **Mr. Wright gave his prior express consent for calls to his cellular telephone.**[31]

The Telephone Consumer Protection Act provides that

> It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—
>
> (A)   to make any call (*other than a call . . . made with the prior express consent of the called party*) using any automatic telephone dialing system or an artificial or prerecorded voice—
>
> . . .
>
>   (iii)   to any telephone number assigned to a . . . cellular telephone service . . . .[32]

Thus, "a call . . . made with the prior express consent of the called party" does not violate the Act.

Under an applicable order from the Federal Communications Commission, "prior express consent is deemed to be granted . . . if the wireless number was provided by the consumer to the creditor, and . . . such number was provided during the transaction that resulted in the debt owed."[33] Target obtained the number that Target was calling (304.374.5651) from Mr. Wright's joint-account request,[34] the "transaction that resulted in the debt."

---

[31]*See* Am. Resps. Reqs. Admis. [Ex. L], Nos. 11–12.

[32]47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added).

[33]In re Rules & Regulations Implementing TCPA, 23 FCC Rcd. 559, 565 (FCC 2008), *quoted in* Pl.'s Reply [Doc. 28] at 5–6.

[34]Facts, ¶¶ 5–7.

Mr. Wright himself does not dispute that he gave his prior express consent for Target to call him using an automatic telephone dialing system or an artificial or prerecorded voice,[35] and that he gave his prior express consent for Target to call him on a cellular telephone.[36]

## II.   Mr. Wright could not unilaterally revoke his prior express consent because that consent was embodied in a bilateral contract.

Courts around the country are widely split about whether a consumer, having given prior express consent to be called on a cell phone, can revoke that consent. A majority rule began to emerge in 2010–13 when several district courts in different federal circuits ruled that consent could not be revoked:

> Relying upon the TCPA's silence on the issue, some courts have held that the TCPA does not permit revocation, whether written or oral. *See, e.g., Kenny v. Mercantile Adjustment Bureau, LLC.*, No. 10-CV-1010, 2013 U.S. Dist. LEXIS 62415, 2013 WL 1855782, at *7 (W.D.N.Y. May 1, 2013) (holding that the TCPA creates a "narrow statutory right not to receive automated calls on a cellphone. . . [and that one who] voluntarily gives it up need not have an opportunity to change his mind later; he has withdrawn from the protection of the statute"); *Saunders v. NCO Fin. Sys., Inc.*, 910 F. Supp. 2d 464, 468-69 (E.D.N.Y. 2012); *Moore v. [Firstsource Advantage, LLC]*, 2011 U.S. Dist. LEXIS 104517, 2011 WL 4345703, at *14 (holding that a verbal request to cease debt collection calls to a cell phone is not sufficient to revoke prior express consent under the TCPA). In addition, some courts hold that consent may be revoked under the TCPA but that only written revocation will be effective. *Moltz v. Firstsource Advantage, LLC*, No. 08-CV-239S, 2011 U.S. Dist. LEXIS 85196, 2011 WL 3360010,

---

[35]Am. Resps. Reqs. Admis. [Ex. L], No. 11.

[36]*Id.*, No. 12.

11

at *15 (W.D.N.Y. Aug. 3, 2011) (requiring that revocation of consent under the TCPA must be in writing); *Starkey v. Firstsource Advantage*, No. 07-CV-662ASR, 2010 U.S. Dist. LEXIS 60955, 2010 WL 2541756, at *6 (W.D.N.Y. March 11, 2010) (holding that a verbal request to cease debt collection calls is sufficient under the TCPA).[37]

But two years ago, the Third Circuit — the first appellate court to weigh in — broke that streak, and held that a consumer could revoke her consent;[38] last year, the Eleventh Circuit reached the same result.[39]

There is no controlling precedent in the Eighth Circuit.[40] And to date, as far as Target knows, no court anywhere has ruled on whether prior express consent can be revoked when that consent is embodied in a written contract. (Throughout this litigation, Mr. Wright's attorney has cited *Buchholz v. Valarity, LLC*,[41] in which the magistrate judge was "persuaded by the reasoning of the Third and

---

[37]*Buchholz v. Valarity, LLC*, No. 4:13CV362 TIA, 2014 U.S. Dist. LEXIS 159239, at *16–17 (E.D. Mo. Nov. 12, 2014).

[38]*Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 272 (3d Cir. 2013).

[39]*Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1255–56 (11th Cir. 2014).

[40]*But see Brenner v. Am. Educ. Servs.*, 575 Fed. Appx. 703, 703 (8th Cir. 2014) ("While this court has not yet addressed the issue of revocation, two other circuit courts have concluded that prior consent to call one's cell phone may be revoked under the TCPA.").

[41]*Buchholz v. Valarity, LLC*, No. 4:13CV362 TIA, 2014 U.S. Dist. LEXIS 159239 (E.D. Mo. Nov. 12, 2014).

Eleventh Circuits with respect to the availability of oral revocation."[42] The *Buchholz* case did involve a written form on which the plaintiff had given his prior express consent,[43] but the form was a unilateral consent form, not a bilateral contract.[44] More to the point, the defendant did argue that Mr. Buchholz did not revoke his prior express consent,[45] but never argued that he could not do so because of the form that he had signed.[46] That issue was never presented to the *Buchholz* court, which mentioned the form only in reciting the facts, and did not address or otherwise mention the form in its analysis.)

But even the courts that have found that a consumer can unilaterally revoke his consent have relied on the common law,[47] and the common law includes the

---

[42]*Id.*, 2014 U.S. Dist. LEXIS 159239 at *18.

[43]*Id.* at *3 n.2.

[44]*See* Consent for Physician Services [Ex. G].

[45]Def.'s Reply Mem., *Buckley v. Valarity, LLC*, No. 4:13-cv-00362-CEJ (E.D. Mo. Jan. 8, 2014) [Ex. H], at 6–10; Def.'s Mem. Law Opp'n Pl.'s Motion Summ. J., *Buckley* [Ex. I], at 6–9.

[46]*See* Def.'s Mem. Supp. Motion Summ. J., *Buckley* [Ex. F]; Def.'s Reply Mem, *Buckley* [Ex. H]; Def.'s Mem. Law Opp'n Pl.'s Motion Summ. J., *Buckley* [Ex. I].

[47]*See Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 270–71 (3d Cir. 2013) ("Our holding that the TCPA allows consumers to revoke their prior express consent is consistent with the basic common law principle that consent is revocable."); *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1255–56 (11th Cir. 2014) ("We instead presume from the TCPA's silence regarding the means of providing or revoking consent that Congress sought to incorporate 'the common law concept of consent.'").

law of contracts.[48] The common law of West Virginia, where Mr. Wright signed

the Joint Account Request and Agreement, and the common law of South Dakota,

whose law the credit-card agreement adopts, both hold that a contracting party

cannot unilaterally modify a contractual term.[49]

This case is distinguishable from the oral-revocation cases because Mr.

Wright's prior express consent was reinforced by a written agreement.[50] Mr.

Wright admits that his prior express consent for Target to call him using an

automatic telephone dialing system, and his prior express consent for Target to

call him on his cellular telephone, were "embodied in the Target credit-card

agreement that applied to [his] Target credit-card account."[51] And he admits that

he could not unilaterally unilaterally change the interest charges or late fees that

---

[48]*See Osorio*, 746 F.3d at 1255 (holding that oral revocation was available "in the absence of any contractual restriction to the contrary").

[49]*Combs v. McLynn*, 419 S.E.2d 903, 907 (W. Va. 1992) ("the party seeking to establish such modification . . . must demonstrate by clear and positive evidence that the minds of the parties definitely met on the alteration" (quoting *Bischoff v. Francesca*, 56 S.E.2d 865 (1949)); *Wheeling Downs Racing Ass'n v. W. Va. Sportservice, Inc.*, 199 S.E.2d 308, 311 (W. Va. 1973) ("A modification of a contract requires the assent of both parties to the contract and mutual assent is as much a requisite element in effecting a contractual modification as it is in the initial creation of a contract."); *Ahlers Bldg. Supply, Inc.*, 535 N.W.2d 431, 435 (S.D. 1995) ("Furthermore, substitution or modification of a contract cannot be effected by the sole action of one of the parties to it. The consent of both is required to alter or supplant a contract fairly made.").

[50]Facts, ¶ 8.

[51]Am. Resps. Reqs. Admis. [Ex. L], Nos. 13–14.

applied to his account.[52] Likewise, Mr. Wright could not unilaterally modify the prior-express-consent provision any more than he could unilaterally modify the credit limit, interest rate, minimum payment, or other terms and conditions of his credit-card account.

III.   **Even if Mr. Wright could have unilaterally revoked his prior express consent, any attempt to do so was ineffective because it was overshadowed by his false denial that he was obligated on the account.**

Mr. Wright could not unilaterally revoke his prior express consent because that consent was embodied in a bilateral contract, and the inquiry ought to end there. But if this Court holds that a caller cannot contractually protect itself against an after-the-fact claim of oral revocation, where the consumer agreed to the contractual provision and has neither obtained the caller's consent to modify the contract nor furnished any consideration,[53] then any attempt to revoke his prior express consent was ineffective because it was overshadowed by his false denial that he was obligated on the account.

Target does not take the view that, once a cardholder has given prior express consent for autodialed calls, Target will keep calling the cardholder even against the cardholder's wishes. When a cardholder asks that Target stop calling a particular number, Target honors that request. But an issue arises when, usually

---

[52]Facts, ¶ 9.

[53]*See* Target's Answers Interrogs. [Ex. J], No. 5 at 4.

months (and sometimes years) after the fact, a cardholder says that he or she revoked consent but Target's records show something different. Target usually does not record such calls, and usually keeps what few recordings it does make only for a very limited time (ordinarily for 90 days), so Target's credit-card agreements all provide contractually for prior express consent as a way of protecting Target against after-the-fact claims of revocation where proof is difficult.

Here, a recording exists of Mr. Wright's conversation with Target. When Target called Mr. Wright on May 21, 2014, Mr. Wright's immediate response was not to ask that Target stop calling him. Instead, Mr. Wright denied that he owed any obligation on his wife's account. He made that denial repeatedly:

> A    I'm getting really tired of telling you people when you call, that's not my account. It is my ex-wife's account. I never authorized my name to be put on, associated with in any shape or form that account.[54]
>
> A    My name should never have been put on that account.
> Q    Well, I mean—
> A    You have nothing with my signature on it agreeing to payment for that account.
> Q    I mean we wouldn't have been able to do it without having your name on it — I mean without you having signed for it.
> A    (Inaudible) twice already. I want proof of my signature and my authorization and your organization has yet failed to provide that to me.
> Q    Okay.

---

[54]Tr. [Ex. M] at 2:12–15.

A      If you could provide me with something that says I authorized my name to be associated with the account, I will pay it in full right now. Otherwise if you cannot provide that proof, I am not legally responsible for it.

Q      Ok, actually, the thing is, your name is on here, and we wouldn't have it otherwise unless you had signed it, so—

A      Then you have to provide me with that information, which you have failed to do.[55]

A      It is not my account, sir.

Q      Like I say, your name is on it though, so—

A      I can go put your name on my account and that makes you legally responsible? No, sir, it does not.[56]

Not until several minutes into the call, after repeatedly denying that he had any association with the account, did Mr. Wright mention ceasing communication. And when he did so, he did it only in connection with his insistence that Target "provide legal verification of the debt," despite his having signed the joint-account agreement:

A      Then provide me with—

Q      Sir, the thing — here's the deal.

A      — (inaudible) authorized and you keep interrupting me.

Q      Here's the deal. You're four months past due. This is affecting your credit.

A      (Inaudible) cease communication until you provide legal verification of the debt to me.[57]

What Target's caller was hearing from Mr. Wright was his denial that he was obligated on the account, not a request that Target cease communication (let alone

---

[55] *Id.* at 2:20 – 3:14.

[56] *Id.* at 4:10–16.

17

a revocation of consent to call his cell phone). Mr. Wright himself, when he finally

got around to saying the words "cease communication" several minutes into the

call, conditioned it "until you provide legal verification of the debt to me." Mr.

Wright's false denial that he was obligated on the account overshadowed whatever

point he might have otherwise made about asking that Target stop calling his cell

phone.

IV. **The subsequent calls from Mr. Wright's attorney were likewise ineffective to revoke Mr. Wright's prior express consent because neither Mr. Wright nor his attorney gave Target a power of attorney or other written instructions authorizing communication with the third party.**

Target instructs its employees not to communicate with any third party

about a cardholder's account, and not to furnish information to or accept

instructions from any third party about a cardholder's account, unless the

cardholder has given a power of attorney or other written instructions to Target

authorizing communication with the third party. This policy is intended both to

prevent identity theft and to comply with the Graham–Leach–Bliley Act.[58]

The Graham–Leach–Bliley Act provides that "[e]xcept as otherwise

provided in this subchapter, a financial institution may not, directly or through any

affiliate, disclose to a nonaffiliated third party any nonpublic personal

---

[57]*Id.* at 4:10–16.

[58]Facts, ¶ 24.

information . . . ."[59] The Act defines "nonpublic personal information" as "personally identifiable financial information— (i) provided by a consumer to a financial institution; (ii) resulting from any transaction with the consumer or any service performed for the consumer; or (iii) otherwise obtained by the financial institution."[60] The Target credit card is issued by TD Bank USA, N.A., which is a "financial institution" within the Act's meaning;[61] the card is serviced by Target Corporation's subsidiary Target Corporate Services, Inc., so Target is TD's agent in providing collection services in connection with Target-branded credit-card accounts.[62]

Target has never received a power of attorney authorizing it to communicate with any third party about the Wrights' account.[63] If Mr. Wright or Mr. Menditto had delivered one, then Target would have immediately stopped calling. While Target is not directly subject to the Fair Debt Collection Practices

---

[59] 15 U.S.C. § 6802(a); *see also* 15 U.S.C. § 6802(b)(1) ("A financial institution may not disclose nonpublic personal information to a nonaffiliated third party unless— (A) such financial institution clearly and conspicuously discloses to the consumer, in writing or in electronic form or other form permitted by the regulations prescribed under section 6804 of this title, that such information may be disclosed to such third party . . . .").

[60] 15 U.S.C. § 6809(4)(A) (defining "nonpublic personal information").

[61] 15 U.S.C. § 6809(3)(A) (defining "financial institution").

[62] Facts, ¶ 25.

[63] Facts, ¶ 23.

Act,[64] it does generally conform its practices to the Act's requirements, and the Act requires that a debt collector cease communication only after notice "*in writing* that that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the consumer."[65] Target regularly receives such written notices from cardholders, and powers of attorney from cardholders or their attorneys, and Target was within its rights not to accept instructions from an unknown person (even one claiming to be an attorney) over the phone who would not deliver a written power of attorney.

Therefore, the subsequent calls from Mr. Wright's attorney were ineffective to revoke Mr. Wright's prior express consent.

## Conclusion

Mr. Wright gave his prior express consent for calls to his cellular telephone. Mr. Wright could not unilaterally revoke his prior express consent because that consent was embodied in a bilateral contract. The inquiry ought to end there.

But if this Court holds that a caller cannot contractually protect itself against an after-the-fact claim of oral revocation, where the consumer agreed to

---

[64]Target is not a "debt collector" within the Act's meaning because Target services Target-branded credit cards from the moment that each account is opened. Target therefore falls within the exclusion for collection activity that "concerns a debt which was not in default at the time it was obtained . . . ." 15 U.S.C. § 1692a(6)(F)(iii).

[65]15 U.S.C. § 1692c(c) (ceasing communication) (emphasis added).

the contractual provision and has neither obtained the caller's consent to modify the contract nor furnished any consideration, then any attempt to revoke his prior express consent was ineffective because it was overshadowed by his false denial that he was obligated on the account. The subsequent calls from Mr. Wright's attorney were likewise ineffective to revoke Mr. Wright's prior express consent because neither Mr. Wright nor his attorney gave Target a power of attorney or other written instructions authorizing communication with the third party.

Therefore, Target respectfully seeks a summary judgment in its favor as to Mr. Wright's claim that Target violated the Telephone Consumer Protection Act.

June 18, 2015.

DYKEMA GOSSETT PLLC

*s/ Brian Melendez*

Brian Melendez
Bar Number 223633
Attorneys for Defendant Target
    Corporation
Dykema Gossett PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Ph. 612.486.1589
Fax 866.637.2804
bmelendez@dykema.com

MSP01\160565.1
ID\BRM - 110048\0066